## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOHNNIE F. FLOURNOY, JR.   )
           )
    Plaintiff,   )
           )  Judge Joan B. Gottschall
   v.      )
           )  Case No. 07 C 5297
PARTHASARATHI GHOSH, M.D. and )
WARDEN TERRY McCANN,   )
           )
    Defendants.  )

## <u>MEMORANDUM OPINION & ORDER</u>

Plaintiff Johnnie Flournoy, Jr., an inmate at the Stateville Correctional Center ("Stateville"), brought a § 1983 action against Defendants Parthasarathi Ghosh, M.D., and Warden Terry McCann, each in their individual capacities. Now before the court are the defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Ghosh moves for summary judgment on Counts I and III of Flournoy's Third Amended Complaint. McCann moves for summary judgment on Count II. All three counts are claims of deliberate indifference to serious medical needs in violation of Flournoy's Eighth Amendment right to be free from cruel and unusual punishment, related to the defendants' alleged failure to ensure that Flournoy received prescription medication needed to prevent the progression of his glaucoma. Because Flournoy has presented evidence creating a material question of fact as to whether Ghosh and McCann were aware of his serious medical condition and exhibited deliberate indifference by failing to ensure that he received the necessary medication, both Rule 56 motions are denied.

# I. BACKGROUND

The following facts are undisputed, except where otherwise indicated.[1]  Stateville is a prison maintained by the Illinois Department of Corrections ("IDOC").  Flournoy alleges that at various times while imprisoned at Stateville, he was not provided with prescription eye drops on a timely basis, sometimes going months without receiving his prescriptions.[2]  He claims that the delay in obtaining this medication caused him permanent harm.  Ghosh is the former Medical Director of Stateville, while McCann was the prison's warden during the time the alleged violations occurred.  As warden, McCann was responsible for the overall operation of the prison facility.  Assistant wardens supervised specific areas, such as the provision of healthcare, and reported to McCann.

## A.  Flournoy's Medical History

In July 2000, at the IDOC Joliet Correctional Center, Flournoy was diagnosed as "glaucoma suspect," with intraocular pressure in each eye of 20 mmHg.  "Intraocular pressure" is the fluid pressure inside the eye, measured in millimeters of mercury. The average intraocular pressure in the population is 10-12 mmHg, and the high limit of average is 21 mmHg.  High intraocular pressure, or ocular hypertension, is associated with a risk of damage to the optic nerve, which is irreversible and can lead to glaucoma. Keeping intraocular pressure low helps to prevent the progression of glaucoma.

Medical records dated December 4, 2003, stated that Flournoy was "glaucoma suspect [in] both eyes."   Between October 2003 and July 2005, he was prescribed

---

[1]     The court deems Plaintiff's Statement of Additional Facts ¶¶ 8 & 9 to be admitted because Ghosh merely states that he "denies the cited reference supports this statement."   Ghosh fails to cite a specific reason for disputing the fact and fails to cite record evidence demonstrating the dispute, as required by the Northern District of Illinois's Local Rule 56.1(b)(3)(B)-(C) and this court's Standing Order.   The court, moreover, believes that the exhibits cited do support the statements.

[2]     In his complaint, Flournoy also alleges that Ghosh prescribed an improper dosage of prescription eye drops, but neither party addresses this claim in their Rule 56 filings.

medicated eye drops to control his ocular hypertension. Flournoy received prescriptions for Xalatan eye drops on December 1, 2004, and March 9, 2005.

Flournoy was transferred into Stateville on March 16, 2005. On that date he was again prescribed Xalatan eye drops for ocular hypertension by Dr. Evaristo Aguinaldo. The prescription indicated that the medication was to be discontinued on July 31, 2005. Flournoy advised prison health care professionals on August 2, 2005, that he had been suffering from ocular hypertension for five years. Flournoy further advised the health care professionals that he was currently without his eye medications. On December 5, 2005, Flournoy again told the health care professionals that he was "glaucoma suspect" in both eyes and suffered from ocular hypertension, and that he "was supposed to be referred to the ophthalmology specialty clinic." On December 12, 2005, Flournoy underwent an Offender Physical Examination, during which he advised the examiner of his history of glaucoma. On December 28, 2005, Flournoy's mother called the prison to say that he was not receiving his glaucoma medication, and she was advised that the medical department would be informed. On February 1, 2006, Flournoy's medical providers were told that he had run out of Xalatan eye drops in August 2005.

On February 21, 2006, Flournoy was seen by Stateville's ophthalmologist, Dr. James Bizzell. Flournoy's intraocular pressures were 26 and 22 mmHg, and his medical history indicated that he had been seen in the glaucoma clinic at a previous institution and that he had suffered from high intraocular pressure since 2001. Dr. Bizzell wrote Flournoy a prescription for eye drops. Dr. Ghosh signed the report of the consultation with Dr. Bizzell, indicating that he had reviewed the report and approved its recommendations.

On October 19, 2006, Flournoy was seen again by Dr. Bizzell. His interocular pressures were 26 and 28 mmHg. The report from that appointment states, "No drops since August," and indicates that Flournoy was to return the next week to have his pressure rechecked. On November 14, 2006, Flournoy was prescribed Alphagan eye drops by Dr. Bizzell.

On January 4, 2007, Flournoy was seen by the ophthalmology department of the University of Illinois Chicago ("UIC") Medical Center. His prescriptions were adjusted, and the recommended prescriptions were approved by Dr. Ghosh. On January 5, 2007, Dr. Ghosh prescribed Flournoy Lumigan eye drops. On April 3, 2007, Flournoy returned to the ophthalmology department at UIC. Prescriptions were recommended by UIC and approved by Dr. Ghosh. On April 12, 2007, Dr. Ghosh prescribed Flournoy Cosept eye drops. On August 31, 2007, Dr. Ghosh wrote Flournoy another prescription for Cosept.

Flournoy was seen by Dr. Mansi Parikh, an ophthalmology resident at UIC, on September 5, 2007. Dr. Parikh testified in her deposition that although Flournoy's medical records indicated that his intraocular pressures were 26 and 24 mmHg on January 24, 2007, when she saw him on September 5, 2007, his pressures were 56 and 59 mmHg. She stated that Flournoy's "story to us" was that he had been without his eye drops since July 2007. (Pl.'s Rule 56.1 Statement of Add'l Facts Ex. 23 (Parikh Dep.) 36:4-19, ECF No. 217-5.) She stated that Flournoy's "pressure was . . . at a very dangerous level, and on examination he had damage to the optic nerve . . . for which that pressure was very dangerous." (*Id.* 34:20-24.) She further stated that going without eye drops intended to prevent pressure buildup in the eye "greatly increases the likelihood of having further damage to the optic nerve." (*Id.* 31:24, 32:1-6.) According to Parikh,

Flournoy "really needed his pressure controlled" (*Id.* 34:24, 35:1.), and "needed to have his eye drops to at least determine how much his pressure would reduce with medication," although even "despite starting the drops, he would need to have surgery in the left eye." (*Id.* 35:8-10, 13-15.)  On September 10, 2007, Dr. Parikh again saw Flournoy, and wrote in her notes that "patient needs medications now as [there is] ongoing damage, clear progression of cupping of the left eye since June of 2007." (*Id.* 40:10-12.)  She stated in a report given to the prison that Flournoy needed to be on eye drops and "has ongoing damage without his medications." (*Id.* 57:4-5, 58:20-21.).

Flournoy had surgery on both eyes at UIC on September 12, 2007.  (*Id.* 39:10).  He then returned for a number of post-surgical checkups.  On September 13, 2007, UIC recommended various medications, and on September 14, 2007, Dr. Ghosh wrote prescriptions based on UIC's recommendations.  On September 24, 2007, Flournoy was again seen at UIC.  Adjustments to his medications were recommended and approved by Dr. Ghosh, who adjusted the prescriptions on September 26, 2007.  On October 2, 2007, Flournoy returned to UIC, where his medications were adjusted; Ghosh wrote new prescriptions for the medications on October 3, 2007.  On October 23, 2007, UIC again recommended adjustments in the medications, and Ghosh adjusted them accordingly.  On November 21, 2007, the medications were again adjusted.

## B.  Flournoy's Grievances

Flournoy filed numerous grievances complaining that he was not provided with his prescriptions.  In most cases, Flournoy's grievances were referred to the Healthcare Unit, and Ghosh responded to the grievances.  Ghosh investigated the grievances by reviewing Flournoy's medical records and contacting the pharmacy.  Flournoy was

informed that the Healthcare Unit had investigated his claims and assisted in his receipt of medications. After Ghosh responded to a grievance, a grievance officer prepared a report, which was given to the warden's office. Grievances that came to the warden's office were reviewed by the Clinical Services Supervisor, or in that person's absence, by the warden's administrative assistant, one of whom signed the grievances as the warden's designee. McCann stated in his deposition that he personally reviewed one emergency grievance submitted by Flournoy and forwarded it to the Healthcare Unit for review.

On December 27, 2005, Flournoy submitted Grievance #0336, requesting to see an eye doctor because of his glaucoma and stating that he had been without his eye medication for months. On March 24, 2006, Dr. Ghosh responded to the grievance with a memorandum stating that Flournoy "received appropriate treatment on 8/2/05. . . 8/19/05 and 8/24/05. . . In future if he has any new medical issues he must contact the [medical technician]." The memorandum did not address Flournoy's request to see an eye doctor or the delay in obtaining his medication, although the record elsewhere shows that Flournoy was seen by Dr. Bizzell on February 21, 2006. On April 5, 2006, the grievance officer indicated, quoting Ghosh's memorandum, that the "issue appears to have been addressed." On September 13, 2006, McCann (by a designee with signature authority) concurred with the grievance officer's response.

On September 18, 2006, Flournoy submitted Grievance #0047, requesting that his medical concerns regarding his eyes be addressed without delay and noting that his prescription had not been refilled, although he had requested a refill a month and a half prior to filing the grievance. The grievance was referred to the Healthcare Unit for a response, which was received on January 18, 2007. The grievance officer's report

indicated that Flournoy was seen by a doctor in October and November 2006 and at UIC on January 4, 2007, and that it appeared the grievance issue had been resolved. It did not specifically mention the delay. On January 25, 2007, McCann (by his designee) concurred with the Grievance Officer's response.

On October 4, 2006, Flournoy submitted an emergency grievance directly to the warden's office, requesting that his prescription be refilled without delay. On October 11, 2006, McCann (by his designee) determined that the matter was not an emergency and that Flournoy should submit the grievance in the normal manner.

On January 22, 2007, Flournoy submitted Emergency Grievance #0487, requesting the prescription medication that had been prescribed for him by UIC on January 4, 2007. On January 30, 2007, McCann (by his designee) determined that it was not an emergency and that the grievance should be handed in the regular manner. Flournoy appealed this grievance to the Administrative Review Board, stating that he did not receive his prescription eye drops until March 12, 2007. Ghosh wrote a memorandum to the grievance office on April 15, 2007, stating that Flournoy had received the medication and subsequently visited UIC again on April 3, 2007. The grievance officer's report, signed by McCann's designee on May 23, 2007, stated that the grievance had been resolved and made no mention of the delay in supplying the medication.

On February 21, 2007, Flournoy submitted Grievance #1096, requesting that he receive his prescription medication. Ghosh responded to the grievance on June 20, 2007, stating that Flournoy had received the medication, with no specific mention of the delay.

The grievance officer's report, signed by McCann's designee on September 17, 2007, stated that the grievance had been resolved, again with no mention of the delay.

On July 16, 2007, Flournoy submitted Grievance #0873, stating that he had been without his medication since June 6, 2007. The grievance officer's report, dated July 27, 2007, stated that "the offender already received his medication [and] . . . . has been evaluated subsequently at UIC hospital on 4/3/07."[3] The report was signed by McCann's designee on May 23, 2007.

On July 29, 2007, Flournoy submitted Grievance #1095, requesting that he receive his prescriptions. The grievance officer's report, signed by McCann's designee on September 17, 2007, states that the refill was completed on September 6, 2007. On March 10, 2008, Flournoy submitted Grievance #1180, stating that although he had requested a refill of his prescription on January 12, 2008, it had not been refilled. Ghosh responded, stating that he evaluated Flournoy on April 1, 2008 and would "investigate why [Flournoy] did not get his prescription refilled." The grievance officer indicated that the grievance had been resolved, and the report was signed by McCann or his designee on August 6, 2008.[4]

**C. Provision of Pharmacy Services at Stateville**

The parties agree that, during the relevant period, Stateville inmates' medications were distributed by nurses or medical technicians. A physician or physician's assistant wrote the prescription, which was countersigned by a nurse or certified medical

---

[3]       This was the same response that was made to Grievance #0487. It appears to be a mistake, as it does not address Flournoy's complaint in Grievance #0873, which stated that his June 2007 prescription had not been refilled two months *after* he was seen at UIC.
[4]       Flournoy claims that he submitted additional grievances between 2008 and the present, but his Third Amended Complaint alleges conduct occurring up until November 2008. The defendants argue that these later grievances fall outside the time frame of the complaint. The court agrees and will not discuss the additional grievances for purposes of the motions for summary judgment.

technician and given to the pharmacy technician. Prescriptions were filled through the Boswell pharmacy in Pennsylvania, under a contract with Wexford Health Sources, Inc. ("Wexford").

The parties dispute whether Ghosh had any responsibility for pharmacy services at Stateville. Ghosh claims that he was not responsible for pharmacy services. He points to his deposition testimony, in which he states that "the pharmacy is located in Pennsylvania. We have a scheduled . . . state employee who comes here to oversee how . . . things are going here. And we also have a pharmacy person in charge at [the] Wexford site. So they are in charge. And we also have regional medical directors for Wexford. And they have more input to the formulary." (Ghosh's Rule 56.1 Statement of Facts Ex. B (Ghosh Dep.) 14, ECF No. 192.)

Flournoy argues that Ghosh did bear the responsibility to ensure that medications were provided. He points to the fact the IDOC and Wexford entered into a Contract for Services (the "Wexford Contract"), under which Wexford provided health care to inmates at Stateville. The Wexford Contract states that the "On-site Medical Director at the Center," a Wexford employee, was the "medical authority" of the site and was charged with operating "the health care program in accordance with State Regulations, and with performance-based audit standards of the American Medical Association (AMA), AMA, American Correctional Association (ACA) and IDOC. The On-site Medical Director shall plan, implement, direct and control all clinical aspects of the health care program." (*See* McCann's Mot. Summ. J. Ex. 9 (Wexford Contract) 1494, ECF No. 189.)

The Wexford Contract further states, in the job description of the On-Site Medical Director, that he or she shall "conduct the liason function for clinical matters with

medical providers outside the center," and ensure "that services of the Center's Health Care Unit are conducted in accord with standards of medical care delineated by State regulations and community practice guidelines." (*Id.* Ex. 10 (Wexford Contract) 1559).

For his part, McCann stated in his deposition that he was unaware of any difficulties that inmates had in receiving prescriptions on a timely basis. He also points to Ghosh's deposition testimony, which states that McCann was not present during meetings in which the pharmacy and medications were discussed. Flournoy disputes McCann's lack of knowledge of his or other inmates' difficulties in receiving prescriptions, citing his numerous grievances about the failure to provide prescriptions that were signed by the warden or his designee, and the fact that his family made calls to the prison on his behalf.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is called for when the nonmoving party is unable to establish the existence of an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. ANALYSIS

**A. Ghosh's Motion for Summary Judgment**

Flournoy's complaint includes two counts against Ghosh, both of which this court has construed as violations of the Eighth Amendment. (*See* Order Feb. 27, 2010, ECF No. 140.) Count I, alleging deliberate indifference to Flournoy's serious medical needs, alleges that beginning in August 2005, Ghosh was aware that Flournoy needed eye drops for his glaucoma and was not receiving them. Ghosh took no action to ensure that the medication was received, even after Flournoy filed numerous grievances requesting the medication. According to Flournoy, the delay in providing the medication put him at substantial risk of harm and loss of vision. Ghosh, he claims, was deliberately indifferent to this risk of harm and failed to properly treat Flournoy's condition. Flournoy further alleges, in Count III, that Ghosh failed to supervise his staff to ensure that Flournoy received his medication on a consistent basis, and failed to establish adequate safeguards to ensure the medication was not delayed or denied. This too amounted to deliberate indifference to Flournoy's serious medical needs, causing him permanent harm. (*See id.* (explaining that Count III alleges a § 1983 claim)).

In order to survive a motion for summary judgment on an Eighth Amendment claim for denial of medical treatment, Flournoy must satisfy both an objective and a subjective element. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). First, he must present evidence that he had an "objectively serious medical need," *King*, 680 F.3d at 1018 (quoting *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001)), meaning "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention," *id.* (quoting *Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 810 (7th Cir. 2000)). Because Flournoy alleges a delay rather than a denial of treatment, he must also present evidence that the delay exacerbated his injury. *Estelle*, 429 U.S. at 104-05; *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010). The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment. *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (citing *Grieveson v. Anderson*, 538 F.3d 763, 778-80 (7th Cir. 2008)).

Second, Flournoy must demonstrate a genuine issue of fact as to whether Ghosh was aware of his medical need and was deliberately indifferent to it. *See Wynn*, 251 F.3d at 593. As the Seventh Circuit recently explained, "[n]egligence—even gross negligence—is insufficient to meet this standard, but the plaintiff is not required to show intentional harm." *King*, 680 F.3d at 1018 (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The standard is akin to criminal recklessness. *Id.*

The court finds that Flournoy has easily met his first burden: to demonstrate that his deteriorating eyesight constituted a serious medical condition. The standard for conditions to be objectively "serious" does not create a high bar. *See King*, 680 F.3d at 1018 (giving as examples of medical conditions that met the objective prong of a deliberate indifference claim "a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns").

Flournoy presented evidence that he has been without his medications for much of the time he has been at Stateville. He presented evidence that he lacked at least some of his medications between August 2005 and February 2006, between August 2006 and October 2006, between July 2007 and September 2007, and between January 2008 and

March 2008. Additional evidence supports the conclusion that Flournoy should have been referred to the ophthalmology clinic in 2005, but was not seen at UIC until January 4, 2007. Thus, the evidence establishes a delay of medical assistance.

Ghosh argues, however, that Flournoy has not established that this delay in receiving medical assistance caused him harm. For evidence creating a disputed question of fact as to whether the delay was detrimental, Flournoy relies on the deposition testimony of Dr. Parikh, particularly her conclusions that it was necessary that Flournoy take medication to prevent further progression of his glaucoma, and that, because he did not take eye drops that reduced pressure in the eye, the likelihood of further damage to the optic nerve increased.

Ghosh argues that the court may not consider Dr. Parikh's testimony, because she was not disclosed to present expert testimony concerning the cause of Flournoy's condition and did not submit an expert report in compliance with Rule 26(a)(2). Flournoy responds that that his disclosure indicated that Parikh would provide an "expert opinion" regarding Flournoy's diagnosis, treatment, and future medical needs based on his IDOC and UIC medical records.

There is no dispute that Parikh was properly identified as a witness as required by Rule 26(a)(2)(A), which requires a plaintiff to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Rule 26(a)(2)(B) requires witnesses to provide a written report along with the disclosure "if the witness is one retained or specially employed to provide expert testimony in the case." Parikh, however, was not "retained or specially employed" to provide testimony; she was Flournoy's treating physician. To address some uncertainty

13

about the disclosures required of this type of witness, Rule 26 was amended in 2010 to require only "summary disclosures in place of complete expert reports, of the opinions to be offered by expert witnesses who were not retained or specially employed to give expert testimony." Fed. R. Civ. P. 26(a)(2)(C). The Rule Advisory Committee's notes to Rule 26(a)(2)(C) further explain:

> A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony.

Ghosh does not argue that the disclosure of the substance of Parikh's testimony is insufficient to meet the Rule 26(a)(2)(C) requirements. The court believes that it was sufficiently clear from the disclosure and from Flournoy's medical records what Parikh's testimony would involve, and in any event, any failure to comply with the disclosure requirements is harmless. The records provided Ghosh with a clear summary of Parikh's observations and conclusions, and the defendants had an opportunity to cross-examine her. The court will consider her testimony for the purposes of the summary judgment motion.

The court concludes that Flournoy has presented evidence raising a question of fact as to whether he suffered permanent harm as a result of lack of medication. Through Parikh's deposition testimony, Flournoy showed that his ocular pressures rose from 26 and 24 mmHg in January 24, 2007, to 56 and 59 mmHg—a dangerously elevated level—on September 5, 2007. Further, he presented evidence that elevated pressure can greatly increase the risk of glaucoma. Ghosh argues that this evidence cannot support the conclusion that Flournoy suffered harm because Flournoy would have "needed surgery

with or without the medication." (Ghosh's Reply in Supp. Mot. for Summ. J. 4, ECF No. 226.) The court finds this argument unavailing. There is no evidence in the record suggesting that the fact that surgery was also indicated did not mean that the high ocular pressure possibly caused by the failure to use the medication for months on end was not in and of itself damaging to Flournoy's optic nerves.

The next question is whether Flournoy presented enough evidence of deliberate indifference to survive summary judgment. According to the Seventh Circuit, "[a] medical professional's deliberate indifference may be inferred when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King*, 680 F.3d at 1018-19 (internal quotation marks and citation omitted). Medical malpractice alone is not a constitutional violation. *Id.* at 1019 (citing *Estelle*, 429 U.S. at 106). Treatment must be "blatantly inappropriate or not even based on medical judgment." *Id.* A prison official is deliberately indifferent when he acts or fails to act "despite his knowledge of a substantial risk of serious harm" to the inmate. *Farmer*, 511 U.S. at 842.

Flournoy has presented evidence supporting the inference that it would have been obvious to any medical professional that he needed prescription eye drops to avoid an increased risk of glaucoma. Flournoy had been diagnosed with ocular hypertension on multiple occasions, and he had repeatedly been prescribed prescription eye drops. Indeed, Ghosh does not argue that Stateville's failure to provide the medication reflected a difference in medical opinion as to whether the eye drops were necessary, or a negligent treatment decision.

Flournoy also presented evidence that Ghosh knew Flournoy was not receiving his medications. Flournoy reported the lack of medications to doctors, filed numerous grievances complaining that he had not received his prescriptions, and even enlisted his mother to call the prison on his behalf. Ghosh responded to many of these grievances on behalf of the Healthcare Unit, indicating that the problem was "resolved." Moreover, the evidence shows more than a brief delay in filling his prescriptions. Flournoy presents facts supporting the conclusion that he was repeatedly denied his medication for periods of up to six months. Flournoy has therefore raised a question of fact as to whether Ghosh knew there could be a substantial risk of harm to Flournoy because he was not receiving his medications.

The remaining issue is whether Ghosh had the power to act to remedy the situation. Ghosh claims that he was not responsible for pharmacy operations at Stateville, and therefore could not be personally responsible for the deprivation of Flounoy's medicine. Ghosh argues that he fulfilled his own obligations to Flournoy by writing all the necessary prescriptions. Once written, the prescriptions were handled by a nurse or medical technician, passed on to a pharmacy technician, and filled by the off-site pharmacy. In essence, Ghosh argues that once he wrote the prescriptions, the matter was out of his hands.

The record, however, indicates that, under the Wexford Contract, the coordination of Stateville's health-care program was the responsibility of the On-Site Medical Officer. That was Ghosh. Ghosh has presented no evidence that establishes that the provision of pharmacy services were not part of the responsibility of the Medical Officer to ensure that the health care program was operating "in accordance with State Regulations, and

with performance-based audit standards of the American Medical Association (AMA), AMA), American Correctional Association (ACA) and IDOC," as required by the Wexford Contract. If ensuring that medications were provided fell within the responsibilities of the Medical Officer, Ghosh cannot escape responsibility by claiming that all he was required to do was hand a prescription over to a medical technician.

Furthermore, the evidence suggests that Ghosh was responsible for responding to inmates' health-related grievances. In his responses to Flournoy's grievances, Ghosh never indicated that the failure to timely provide the prescriptions was ever investigated or addressed. And the court also notes that Ghosh never explained *why* Flournoy did not receive his medication. This leaves a fact-finder to speculate as to what went wrong: Was the medication unavailable from the pharmacy? Did a nurse or technician fail to handle the prescriptions correctly? Or was the medication deemed too expensive and deliberately withheld? Without any explanation of what happened, the court cannot conclude that Ghosh had no authority as Medical Officer to resolve the situation. The court concludes that there is a question of material fact as to whether Ghosh bore some responsibility to ensure that Flournoy and other inmates received medications without undue delay, and that, knowing the prescriptions were repeatedly delayed, he did nothing to address the problem.

Construing the evidence and all reasonable inferences in Flournoy's favor, he has set forth evidence raising a genuine dispute of material fact as to whether Ghosh's failure to address his repeated requests for medication and to ensure that the medical staff provided the medication without undue delay constituted deliberate indifference to his

medical needs in violation of the Eighth Amendment. Ghosh's motion for summary judgment on Counts I and III of the Third Amended Complaint is denied.

**B. McCann's Motion for Summary Judgment**

McCann argues that Flournoy cannot demonstrate that McCann acted with deliberate indifference to his serious medical needs, in violation of § 1983. He relies on the fact that a warden is generally shielded from liability where a plaintiff is receiving ongoing care from health care professionals. The warden "is entitled to relegate to the prison's medical staff the provision of good medical care." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009); *see also Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (the fact that plaintiff's medical needs were being addressed by the medical staff insulated the warden from liability); *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (warden that "reasonably relied on the expertise of the medical professionals . . . did not act with deliberate indifference"). It is undisputed that, during the time period at issue, Flournoy received treatment for glaucoma from five or six doctors and additional treatment from specialists at the UIC Medical Center. McCann argues that he properly relied on the health care staff to provide appropriate care.

McCann claims that his only responsibility as warden was to delegate authority to the prison medical staff and to his subordinates, who reviewed medical grievances on his behalf. (McCann's Mem. in Supp. Mot. for Summ. J. 5, ECF No. 189.) In arguing that making sure that treatment was appropriate was simply not his job, McCann quotes at length from *Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009). That case, however, undermines his argument. *Burks* highlighted the contrast between the limited role of a prison complaint examiner in addressing a prisoner's medical treatment and the greater

responsibility that potentially fell to a prison administrator—in that case, the head of the medical unit. Although Burks's claim against the complaint examiner was dismissed, his claim against the administrator went forward. *See id.* at 594.

McCann claims that his role with respect to prison health care is akin to that of the complaint examiner, who—having completed her assigned tasks—was required to do no more to help an inmate. But McCann was the head administrative officer of the prison, responsible for overseeing its operations. As this court stated previously when denying McCann's motion to dismiss, a more "subtle rule" governs "the degree of insulation that a prison warden enjoys." (Order Feb. 23, 2010, ECF No. 138.) Prison officials may be found to be deliberately indifferent to a prisoner's serious medical needs if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *see also Reed v. McBride*, 178 F.3d 849, 854-56 (7th Cir. 1999) (warden was required to act when prison officials repeatedly denied an inmate life-sustaining medication and food). Where a plaintiff informs prison officials that he is being denied access to health care, those officials may be liable under 42 U.S.C. § 1983 for their inaction. *See Estelle*, 429 U.S. at 104-05 (deliberate indifference to medical needs violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to their prisoner's needs or by prison guards in intentionally denying or delaying access to medical care").

The question, then, is whether McCann was aware that Flournoy was being denied medical care. Flournoy filed numerous grievances that were sent to the warden's office. Depending on the content of a particular grievance, McCann might justifiably

rely on the response of the Healthcare Unit to conclude that a medical issue was being properly handled by medical staff. He, of course, had no medical training or basis on which to disagree with a treatment plan. *See Burks*, 555 F.3d at 595.

In Flournoy's case, however, recognizing that the prescriptions should be filled required no medical judgment. The response to each of the medical grievances was that they were "resolved." But even a cursory review of the grievances shows that they were not "resolved," as no explanation was ever given for the delays in providing medication, which happened again and again. In each grievance, Flournoy reported that he had not timely received his prescriptions. Ghosh's responses stated that Flournoy ultimately received the medication, but no mention was made of nor explanation given for the fact that Flournoy had waited months to receive the prescriptions. The grievance officer's reports merely repeated Ghosh's statements. In one instance, Ghosh's statements actually responded to a different grievance and were completely unresponsive to the grievance at issue; the grievance officer did not notice the discrepancy and parroted the statements despite the fact that they made no sense as applied to the grievance at issue.

McCann was entitled to rely on the medical staff's judgment as to proper treatment, but not to ignore the fact that Ghosh and the grievance officer never addressed the failure to provide Flournoy's prescriptions in a timely manner. As Judge Shadur recently explained in *Martinez v. Garcia*, "the clearly nonresponsive nature of the healthcare unit's 'responses' to grievances filed by an inmate" could alert prison officials to a risk to the inmate's health. No. 08 C 2601, 2012 WL 266352, at *5 (N.D. Ill. Jan. 30, 2012). Even someone with no medical training could have concluded based on

Flournoy's grievances that something might be seriously wrong with the way that prescription medications were being provided at Stateville.

McCann argues that, regardless of the content of Flournoy's grievances, he cannot be held personally responsible for any constitutional violation Flournoy might have suffered because he "did not become involved with prison healthcare." (McCann's Reply in Supp. Mot. for Summ. J. 1, ECF No. 222.) He attended no health care meetings and was thus unaware of any problems with the provision of prescriptions. Nor did he review the grievances that bore his signature—they were reviewed and signed by his designee. (*Id.* at 2.)

A warden is not responsible for individual incidents that occur in the day-to-day operation of a prison, but only for systematic lapses in policies meant to protect prisoners. *Steidl v. Gramley*, 151 F.3d 739, 741-42 (7th Cir. 1998). The court believes that Flournoy has presented evidence from which a fact-finder could conclude that McCann was alerted to a systematic failure of the medical staff to promptly provide prescriptions. Flournoy filed numerous grievances. His emergency grievances were sent directly to the warden's office, although they were all reissued as regular grievances because, at Stateville, emergency grievances were limited to those deemed to be life-threatening.[5] McCann claims that he did not see most of the grievances, but he does not present evidence demonstrating that he had no responsibility to review the grievances, and all of the grievance reports bore his signature. The court does not believe that McCann can use the fact that he delegated much of the review of medical grievances to administrative assistants to insulate himself from liability for problems of which the grievances would

---

[5]        Judge Shadur noted that the fact that a grievance would be afforded emergency treatment only if McCann deemed it life threatening was "illogical and inhumane." *Martinez*, 2012 WL 266352, at *2 n.4.

have put him on notice. Under the Illinois Administrative Code, "no individual may routinely perform the Warden's duties, [although] a Warden may designate another person to perform his or her duties 'during periods of his or her temporary absence or in an emergency.'" *Id.* (citing 20 Ill. Admin. Code § 504.805(b)).

Given McCann's responsibility to review the grievances, the fact that they bore his signature, and the fact that Flournoy's relatives attempted to contact the prison on his behalf to ask that he receive his medications, Flournoy has raised a question of fact as to whether the McCann condoned or turned a "blind eye" to unconstitutional conduct related to the provision of prescription medications at Stateville. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Flournoy has therefore presented sufficient evidence to survive a motion for summary judgment as to McCann's deliberate indifference to his serious medical needs. The court denies McCann's motion for summary judgment.

## IV. CONCLUSION

For the reasons explained above, the court denies Ghosh's and McCann's motions for summary judgment on Flournoy's Third Amended Complaint.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 24, 2012